Eric M. ENOS, Plaintiff-Appellant,

v.

John O. MARSH, et al.,
Defendants-Appellees.

No. 84–1640.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 9, 1984.

Decided Aug. 27, 1985.

---

Alan T. Murakami, Brown & Johnston, Boyce R. Brown, Jr., Honolulu, Hawaii, for plaintiff-appellant.

Fred R. Disheroon, Claire L. McGuire, Jacques B. Gelin, Dept. of Justice, Washington, D.C., Daniel A. Bent, U.S. Atty., Michael Chun, Asst. U.S. Atty., F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Randall Y.K. Young, Dep. Atty. Gen., Michael A. Lilly, Atty. Gen., Honolulu, Hawaii, for defendants-appellees.

Before HUG, TANG, and SCHROEDER, Circuit Judges.

TANG, Circuit Judge:

Eric Enos appeals a district court order 616 F.Supp. 32 denying a preliminary injunction to enjoin construction of the Barbers Point deep draft harbor project and granting the federal defendants'/appellees' motion for summary judgment on all claims. Enos raises claims under the Endangered Species Act, the National Environmental Policy Act, and the Water Re-sources Development Act. For the reasons stated below, we affirm.

## BACKGROUND

Under section 301 of the River and Harbor Act of 1965 (Title III of P.L. 89–298), Congress authorized construction of a deep draft harbor at Barbers Point on the island of Oahu, Hawaii. Barbers Point is located on the southwest coast of the island in the Ewa district, adjacent to the district of Waianae. The project is to provide a second deep draft harbor for commercial and industrial use on Oahu.

As authorized, the project is the joint responsibility of the United States Army Corps of Engineers (Corps) and the State of Hawaii (state), through its Department of Transportation. The Corps is responsible for the construction of the project's principal features: an entrance channel 4280 feet long, 450 feet wide, 38–42 feet deep and a 92 acre inner harbor. The State of Hawaii is to provide all lands, easements, rights of way, and a portion of the project costs. In addition, the state plans to fund and construct shoreside terminal and transfer facilities.

In 1975, before the start of construction, the Corps initiated environmental studies pursuant to the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, et seq. (1982). On April 30, 1976, the Corps issued a draft Environmental Impact Statement (EIS) for the project. The final EIS was filed December 27, 1976, and a Supplemental EIS was filed on February 27, 1977. In 1982, the Corps prepared an Environmental Assessment, and determined that any changes in planning or circumstances since 1977 did not require an additional Supplement to the EIS.

The Corps awarded the construction contract in March, 1982, and construction began in August of that year.

On October 5, 1982, certain residents of Waianae filed a complaint to enjoin construction of the harbor project. Waianae residents sought relief from the Secretary of the Army, the District Engineer for the

Honolulu United States Army Engineer District, the Secretary of the Interior, and the Hawaii State Departments of Transportation, Land and Natural Resources, and Planning and Economic Development. Plaintiffs alleged violations under various federal environmental statutes and regulations including the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531 *et seq.* (1982), the National Environmental Policy Act, and the Water Resources Development Act (WRDA), 42 U.S.C. § 1962d–17 (1982).

On December 29, 1982, the district court imposed a temporary restraining order enjoining all blasting operations. Waianae residents moved for a preliminary injunction which was heard February 3–5, 1983. Following that hearing, the court dissolved the temporary restraining order on February 9. The Ninth Circuit denied Waianae residents' emergency motion for a stay of execution of that order. Plaintiffs also moved the district court for a permanent injunction and for partial summary judgment.

On January 5, 1984, in a thorough and well-reasoned order, the district court denied Waianae residents' motions and granted the federal defendants' cross-motion for summary judgment on all claims.

Eric Enos, a resident of Waianae, alone appeals the judgment from the district court.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

In reviewing a grant of summary judgment, we view the evidence in the light most favorable to the opposing party and determine whether any genuine issue of material fact remains for trial and whether the substantive law was correctly applied. Fed.R.Civ.P. 56(c); *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981 (9th Cir.1985). The grant of summary judgment is reviewed *de novo. Id.*

---

1. *See* 16 U.S.C. § 1533 for the procedure by which the Secretary of the Interior proposes

## DISCUSSION

### I. *The Endangered Species Act*

In mid-1976 a plant species thought to be extinct, the *Euphorbia skottsbergii* var. *kalaeloana* ('akoko), was found in the vicinity of the Barbers Point harbor project. At that time, the United States Fish and Wildlife Service (FWS) had proposed that the 'akoko be designated as endangered under the ESA. 41 Fed.Reg. 24523 (June 16, 1976). The 'akoko was officially listed as an endangered species on August 24, 1982. 47 Fed.Reg. 36847 (1982).

#### A. Standard of Review

■ This court interprets *de novo* the statutory provisions of the ESA. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The actions of the Corps and the FWS are reviewed in accordance with the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1982); *Friends of Endangered Species, supra,* 760 F.2d at 981. Administrative agency decisions will be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That is, the agency must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2257, 76 L.Ed.2d 437 (1983) (citation omitted) (quoted in *Friends of Endangered Species,* 760 F.2d at 982).

#### B. The FWS and the Corps did not violate the Endangered Species Act, 16 U.S.C. § 1536.

Enos first argues that the 'akoko plant should have been given the same protections during the period that it was *proposed* to be listed as endangered as when the plant was officially *designated* as endangered.[1] Plaintiff contends specifically

and lists a species as endangered or threatened.

that during the period the 'akoko was proposed to be listed as endangered, the ESA obligated the Corps to insure that its actions, as required under 16 U.S.C. § 1536(a)(2), were not likely to jeopardize the existence of the plant species and to commence the consultation process, required under the same subsection, with the FWS.[2] As shown below, however, the Act clearly and logically differentiates between those duties owed a species designated by the Secretary of the Interior as endangered and those duties owed a species proposed for listing.[3]

The ESA contains both substantive and procedural provisions. *See Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985). For purposes of the issue raised by Enos, the Act substantively requires federal agencies to ensure that their actions are not "likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of the critical habitat of such species. 16 U.S.C. § 1536(a)(2).

In its 1978 amendments to the ESA, Congress prescribed a three-step process to ensure compliance of this substantive provision. *See* Act of Nov. 10, 1978, Pub.L. No. 95–632, 1978 U.S.Code Cong. & Ad. News (92 Stat.) 3751; 3752–53 (codified within 16 U.S.C. § 1536); *Thomas v. Peterson*, 753 F.2d at 769. First, a federal agency proposing to take action must inquire of the Fish and Wildlife Service whether "any species which is *listed* or *proposed to be listed* may be present" in the area of proposed action. 16 U.S.C. § 1536(c)(1) (em-

phasis added). Second, if "such species" is present, the agency must prepare a "biological assessment" to determine whether the species "is likely to be affected" by the action. *Id.* The ESA, then, expressly provides that federal agencies are obligated to gather this information with respect both to species proposed for listing and those which are listed. However, the obligations owed each group are co-extensive only until this point.

Third, if the assessment determines that an "endangered species or a threatened species" is likely to be adversely affected, *id.* § 1536(c)(1), the agency must formally consult with the FWS. *See id.* § 1536(a)(2). After initiation of consultation, the federal agency "shall not make any irreversible or irretrievable commitment of resources" which would foreclose alternative action which would not jeopardize the existence of an endangered or threatened species. *Id.* § 1536(d). The formal consultation results in the issuance of a "biological opinion" by the FWS. *See id.* § 1536(b). If the biological opinion concludes that the proposed action would jeopardize the species or adversely modify the critical habitat, then the action may not go forward unless the FWS can suggest an alternative that avoids such jeopardy, destruction, or adverse modification. *Id.* § 1536(b)(3) and (b)(4). Without exception, these latter provisions refer to protection owed "endangered species or threatened species."

In contrast, the ESA, as amended in 1979, requires that a federal agency "confer" with the FWS on action likely to ad-

---

**2.** The FWS acts pursuant to the authority of the Secretary of the Interior, the named party in this action. *See Romero-Barcelo v. Brown*, 643 F.2d 835, 856 n. 43 (1st Cir.1981), *rev'd on other grounds*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

**3.** On December 10, 1979 the FWS withdrew its proposal to list the 'akoko because certain statutory time requirements imposed by 1978 amendments to the ESA had not been met. 45 Fed.Reg. 58166 (1980). On September 2, 1980, the FWS again proposed to list the 'akoko as an endangered species. 45 Fed.Reg. 58167. During the period the 'akoko was neither listed nor proposed to be listed, we agree with the District

of Columbia Court of Appeals that the 'akoko did not come within the protections of the ESA. *Wilson v. Block*, 708 F.2d 735, 747–51 (D.C.Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). Additionally, although Enos complains of actions taken by the FWS and the Corps since 1976, he only refers us to the ESA as amended in 1979. Although our conclusion that the statute's protections are triggered by the listing of a species as endangered or threatened would probably apply to the ESA since 1973, *see* discussion of subsequent legislative history *infra* pp. 1369–1370, we only decide that question as applied to the ESA as amended in 1979.

versely impact "any species *proposed to be listed*" or "critical habitat *proposed to be designated* for such species." *Id.* § 1536(a)(4) (emphasis added). Significantly, federal agencies are not required to forego making resource commitments which could result in action adversely affecting the proposed species. *Id.*

The two provisions that expressly provide for protection for species proposed for listing require that a federal agency issue a biological assessment, *id.* § 1536(c), and confer with the FWS, *id.* § 1536(a)(4). The ESA requires no more.[4]

Legislative history confirms this interpretation of the Endangered Species Act. A report from the House and Senate conference committee adopted during the 1978 amendments explains that section 1536 requires that a "biological assessment [be] conducted for the purpose of identifying the presence of any *proposed* or listed species which might be affected" where the FWS has advised that such species may be present. H.Conf.Rep. No. 95–1804, 95th Cong., 2d Sess. 19, *reprinted in* 1978 U.S. Cong. Code & Ad.News 9453, 9486 (emphasis added). A conference committee report from the 1979 amendments explains that section 1536(a)(4) is intended to require federal agencies to enter into "informal discussions" about the possible adverse impact of agency actions on proposed species. H.Conf.Rep. No. 96–697, 96th Cong., 1st Sess. 13, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2572, 2576. The provision, the report explains, does not require that "federal agencies enter into formal ... consultation" under subsection (a)(2). *Id.* at 1979

U.S.Code Cong. & Ad.News 2572, 2577. In the same report, the committee indicated that the purpose of a listing proposal is to determine whether a species is endangered or threatened and should be listed, and therefore the protections of the ESA should not apply until a species has been formally listed. *Id.* Although not controlling, this subsequent legislative history is entitled to significant weight. *In re Adams*, 761 F.2d 1422, 1426 (9th Cir.1985) (subsequent amendment and legislative history relevant when Congress intends to clarify pre-existing law); *Wilson v. Block*, 708 F.2d 735, 750 (D.C.Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983) (1979 House committee and conference reports entitled to significant weight in interpreting 1978 amendment of ESA, codified in 16 U.S.C. § 1536(a)(2)); Singer, Sutherland Stat. Const. § 49.11, p. 414 (4th ed. 1984). Similarly, legislative pronouncements after the enactment of the ESA in 1973 repeatedly emphasize that the listing of the species as endangered or threatened triggers the full protection of the Act. *See, e.g.,* H.Rep. No. 96–167, 96th Cong. 1st Sess. 3, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2557, 2559; H.Rep. No. 95–1625, 9th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9453, 9455. *Cf. Wilson v. Block,* 708 F.2d at 749–50.[5] Additionally, federal regulations outlining the formal consultation process expressly apply to "listed species," 50 C.F.R. §§ 402.03, 402.04 (1984), which is defined as any species designated as endangered or threatened, *id.* § 402.02.

---

4. By not limiting federal agencies from making resource commitments, Congress has chosen to allow federal agencies to go forward with projects which may affect species proposed for listing. Therefore, it would make little sense to require formal consultation and the issuance of a biological opinion requiring alternative agency action as plaintiff suggests. In explaining subsection 1536(a)(4), a House Conference Report observes that federal agencies which do commit resources and foreclose alternative action do so with the risk that the species will eventually be listed and the prohibitions of the ESA will apply. H.Conf.Rep. No. 96–697, 96th

Cong., 1st Sess. 13, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2557, 2572, 2577.

5. We are not unaware of the difficulties in using subsequent legislative interpretations of prior statutes, *see Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 117–20, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980). We find, however, that the subsequent history that we rely upon is reliable. Congress repeatedly and consistently observed that the full protections of the Act are triggered by designation as endangered. Moreover, this interpretation is the most reasonable construction of the language of the statute.

■ The record indicates that both the Corps and the FWS fully complied with the ESA during the period the 'akoko was proposed for listing. At the request of the Corps, the FWS conducted a biological assessment, issued September 18, 1979. Throughout, the Corps conferred, on an informal basis, with the FWS regarding the status of the 'akoko. Plaintiff does not dispute these facts. The Corps and the FWS thus fulfilled their statutory obligations vis-a-vis the 'akoko.

■ Enos observes that in its Environmental Impact Statement, the Corps assured that it would treat the 'akoko as if it were listed as an endangered species. Enos claims that the Corps, therefore, should be estopped from denying it owed the 'akoko the protections under the ESA.

Enos lacks authority for this position.[6] We decline to hold the Corps to the standards of the ESA because it stated that it intended to treat the species as endangered.[7] Such a ruling could deter voluntary efforts which could both work in the best interest of the species and permit agency action to go forward if the species does become listed.

C. The Secretary did not violate the Act by failing to designate a critical habitat.

■ Plaintiff next contends that the Secretary of the Interior abused his discretion by failing to designate a critical habitat for the 'akoko plant subsequent to its listing as an endangered species.

The Secretary's determination not to designate a critical habitat for the 'akoko concurrent with its listing as an endangered species will be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under the relevant ESA provision, the Secretary of the Interior is to designate "to the maximum extent prudent" a critical habitat for an endangered species concurrent with its listing. 16 U.S.C. § 1533(a)(3) (1978).[8] A critical habitat is defined as:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed ..., upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

At the time the 'akoko became listed as an endangered species, the Secretary declined to designate a critical habitat for it. 47 Fed.Reg. 346846, 346848 (Aug. 24, 1982). The Secretary reasoned that since the 'akoko had been found in a non-native habitat, the biological and physical features essential to its existence could not be known. *Id.* Therefore, its critical habitat could not be determined. *Id.*

Enos concedes that the statutory phrase "to the maximum extent prudent" gives the Secretary some discretion not to designate a critical habitat. However, based

---

**6.** *Sierra Club v. Sigler,* 695 F.2d 957, 965–66 (5th Cir.1983), is inapposite. There, pursuant to NEPA, the federal agency voluntarily chose to follow newly promulgated federal regulations governing the preparation of an EIS instead of following old guidelines. The court reasoned that since a purpose of NEPA is to provide a procedure by which to provide consideration of the environmental impact of agency action, the federal agency should be adjudged according to the procedure it chose to follow. *Id.* at 966. The instant case, of course, involves a different statute, and as has been discussed, the Corps had no pre-existing obligation under the ESA.

**7.** Although transplant efforts of the Corps proved highly unsuccessful, the district court did not find that defendants had acted in bad faith or in an attempt to evade the requirements of the Act. Enos does not contest this finding.

**8.** Subsequently, Congress amended this provision. *See* 16 U.S.C. § 1533(a)(3) (1982). Neither party disputes the district court's interpretation that the 1978 version applies in this case.

upon a reading of the provision's legislative history, Enos contends that the Secretary may decide not to designate a critical habitat for an endangered species only when it would be in the best interest of the species not to do so. *See* H.Rep. No. 95–1625, 9th Cong., 2d Sess. 16–17, *reprinted in* 1979 U.S.Code & Ad.News 9453, 9466–67. Enos argues that since the Secretary did not designate a critical habitat based on the best interests of the species, but because he lacked adequate information to make that determination, the Secretary's decision is arbitrary and capricious, and should not be upheld.

The legislative history does indicate that the Secretary may only fail to designate a critical habitat under rare circumstances. *Id.* However, we conclude that the relevant provision does not mandate a determination based on inadequate information, and therefore conclude that the Secretary did not abuse his discretion.[9]

■ Furthermore, since the listing of the 'akoko, approximately 5200 'akoko plants have been found outside the project's vicinity in a protected area of Barbers Point Naval Air Station. Several hundred more are being nursed and grown in various arboreta. The 'akoko remaining in the harbor project area number approximately 50. Because only 2% of the 'akoko plant population was to be found in the harbor project area when the 'akoko became listed, the Secretary's failure to designate that site as a critical habitat cannot be said to be arbitrary or capricious.

## II. *National Environmental Policy Act*

Enos challenges the Corps' preparation of its Environmental Impact Statements under the National Environmental Policy Act on three grounds.

A. The Corps did not violate NEPA by failing to discuss the environmental effects of state-planned shoreside facilities.

■ Enos first argues that the Corps violated NEPA by failing to discuss the environmental effects of the state-planned shoreside facilities in its 1976 EIS and 1977 Supplement. The shoreside facilities include berthing areas, terminals, roadways, and utility improvements.

An EIS is required for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Whether the shoreside facilities planned by the state are to be included in the EIS turns on whether that action is "federal." *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 327 (9th Cir.1975). This determination requires "careful analysis of all facts and circumstances surrounding the relationship," *Friends of the Earth,* 518 F.2d at 329.

Citing *La Raza Unida of Southern Alameda County v. Volpe,* 488 F.2d 559 (9th Cir.1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974), and *Sierra Club v. Volpe,* 351 F.Supp. 1002 (N.D.Cal.1972), Enos argues that the state's shoreside facilities and the federal harbor project are so functionally interdependent that the projects constitute a single federal action. In *La Raza Unida* and *Sierra Club v. Volpe* certain segments of highway construction projects were designated as "state" and others as "federal" in an attempt to avoid the requirements of NEPA. Here, the state and federal projects serve complementary, but distinct functions; they are not as interrelated as were the parts of the same highway construction. *Accord Friends of the Earth,* 518 F.2d at 328–29.[10]

Two other important factors convince us that the action by the state cannot be

9. This provision has been subsequently amended to take account of the possibility that sufficient information may not be available to make a critical habitat determination. The section now provides that the designation be made to the maximum extent prudent and *determinable.* 16 U.S.C. § 1533(a)(3) (1982).

10. Nor has there been an attempt, as in *La Raza Unida* and *Sierra Club v. Volpe,* to circumvent the prescriptions of NEPA. As a matter of fact, the state has filed an EIS outlining the environmental impact of its planned shoreside facilities.

termed "federal" for purposes of NEPA. First, the shoreside facilities are completely state-funded. As this court observed in *State of Alaska v. Andrus*, 591 F.2d 537, 541 (9th Cir.1979), "[w]here federal funding is not present, [we have] generally been unwilling to impose the NEPA requirement" of filing an EIS. Second, the federal government exercised no control over the planning and development of these facilities. Rather, local officials have been the only relevant decision-makers. *Accord Friends of the Earth*, 518 F.2d at 329; *Bradley v. U.S. Dept. of Housing & Urban Development*, 658 F.2d 290, 294 (5th Cir. 1981). Lacking both federal funding and federal supervision over the development of the facilities, the construction of the shoreside facilities is not "federal" action for purposes of NEPA.[11]

B. The Corps adequately discussed the secondary effects of the project in its EIS.

Enos argues that the Corps did not adequately detail the secondary or socio-economic effects of the Barbers Point harbor project. He contends that the Corps merely acknowledged the possible secondary effects, such as increased urbanization, but did not sufficiently analyze or document their impact to the extent necessary under NEPA to inform decision-makers or the public. Defendants acknowledge that they are obligated to discuss secondary impacts which significantly affect the environment, *see Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 783 (9th Cir.1980); 40 C.F.R. § 1500.8(a)(3)(ii) and 33 C.F.R. § 209.410(i), but maintain that their discussion is adequate in light of the information available to them.

The district court reviewed the Corps' discussion in the EIS, and concluded that the "highly speculative nature of the potential effects and ability of state and local authorities to limit ... such effects ... render the EIS 'minimally acceptable.'"

■■■ The adequacy of an agency's preparation of an EIS is reviewed under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(D). Agency action will be set aside if undertaken without observance of procedures required by law. We review the district court's conclusion to determine whether it was based upon an erroneous legal standard or clearly erroneous findings of fact. *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir.1984); *Adler v. Lewis*, 675 F.2d 1085, 1096 (9th Cir.1982). Under this standard of review, we employ a "rule of reason" and evaluate "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *State of California v. Block*, 690 F.2d 753, 761 (9th Cir.1982), *quoting Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974). This requires a reviewing court to assess whether the EIS promotes both informed decision-making and public participation. *Block*, 690 F.2d at 761; *Trout Unlimited, Inc.*, 509 F.2d at 1283. However, in its review, our court may not substitute its judgment for that of the agency, but is instead limited to assuring that the agency considered the environmental consequences of its proposed action. *Adler v. Lewis*, 675 F.2d at 1096.

**11.** The EIS did not have to treat the shoreside facilities as part of the federal action. The environmental effects of the state action were not ignored, for the state project was taken into account as one of the secondary effects of the federal action.

Enos also urges most strongly that because the Corps includes the economic benefits of a harbor with shoreside facilities in operation in its cost-benefit analysis in the EIS, it must also include the costs of those facilities, otherwise the analysis will be arbitrarily skewed. *See Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th

Cir.1983). Enos refers to benefits, such as savings in overland transportation costs, which presume that the state's shoreside facilities are operational. Enos does not specify which costs should have been included in the EIS. Presumably, the costs would be those construction costs to be borne by the State of Hawaii, not by the federal government, and would therefore not need to be included in the EIS. The socio-economic and demographic effects of the shoreside facilities, which Enos might consider as costs, are adequately discussed in the EIS. (*See infra* Part III, B.)

The EIS specifically addresses industrial growth. The Corps takes the position that growth and expansion of existing industry is expected in the area with or without the new harbor facility, but that industrialization may be spurred as a result of the project. The EIS states that the relocation of existing industries in the area is expected, but that the development of new industries is not expected because Hawaii's basic industries are service-oriented, and those industries will grow commensurate with the population. The EIS discusses the potential increase in population, acknowledging that the urbanization of lands which are currently undeveloped or in agricultural use may be "far reaching." The EIS acknowledges that harbor development may affect the level of traffic, noise and air pollution, as well as the demand for water, power, sewage treatment facilities and roadway improvements.

The cases relied upon by Mr. Enos do not support his position. In *City of Davis v. Coleman*, 521 F.2d 661, 674–75 (9th Cir. 1975), the growth-inducing effects expected from the construction of an interchange on a major interstate highway were not addressed in the EIS. Similarly, in *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 783 (9th Cir.1980), there was almost no discussion in the EIS of the secondary effects of the construction of ten miles of a U.S. highway connecting several small towns.

In contrast, the Corps repeatedly alerted decision-makers and the public to the potential secondary effects of the harbor project. Discussion was not extended; however, such consequences are speculative, and dependent upon local development and zoning policies. *Accord Concerned Citizens on I 190 v. Secretary of Transportation*, 641 F.2d 1, 5–6 (1st Cir.1981). Therefore, we agree with the district court that the Corps' discussion was acceptable.

C. The Corps did not violate NEPA by failing to file another EIS Supplement.

Enos contends that the Corps was required to supplement its 1976 EIS and 1977 Supplement in light of new information.

A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions even after release of an EIS. *Stop H–3 Association v. Dole*, 740 F.2d 1442, 1463 (9th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023–24 (9th Cir.1980). Under federal regulations, the Corps must supplement an EIS if it "makes substantial changes in the proposed action that are relevant to environmental concerns "or" [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i) and (ii) (1984). An agency's decision not to supplement an EIS in light of new information will be upheld if it is reasonable. *Stop H–3 Association*, 740 F.2d at 1463; *Warm Springs Dam Task Force*, 621 F.2d at 1024.

1. *Increase in harbor size.* Enos contends that the change in harbor size from 246 to 360 acres requires an EIS supplement. Plaintiff concedes this change was noted in the 1977 Supplement. Enos does not explain how the environmental effects of the increased acreage differ from those assessed. As discussed, the Corps has adequately outlined the secondary environmental effects of the harbor.

2. · *Archeological discoveries.* Plaintiff indicates that certain archeological deposits, not identified in the EIS, should be incorporated into an EIS Supplement. Plaintiff acknowledges there is disagreement among the experts over the deposits' scientific value, but contends that the Corps has a duty to incorporate conflicting viewpoints in its EIS. *See California v. Block*, 690 F.2d at 770–71.

Defendants' duty to incorporate conflicting viewpoints only arises if the information is significant enough to require discussion in an EIS. In connection with the National Preservation Act, the Corps

has made a determination of "no adverse effect" as to the archeological sites. These determinations have been approved by both the State Historic Preservation Office and the Advisory Council on Historic Preservation. The Corps' decision that the discovery or research potential of the cultural deposits was not of such significance so as to warrant EIS supplementation is reasonable.

■■■ 3. *Revised population statistics.* Enos notes that the Oahu population projections used by the Corps in determining the feasibility of the harbor have been revised downward 11.7% by the year 2000 (from 1,039,000 to 917,400 persons) and asserts that failing to account for this population change arbitrarily inflates shipping demand for the harbor. Population projections are necessarily speculative; the significance of this new information uncertain. Moreover, the significance goes to the need for the harbor, not to its potential environmental effects. The Corps' decision not to supplement was a reasonable one.

■■■ 4. *Proposed development plans.* The Waianae District proposed a development plan calling for the maintenance of agricultural and rural land use patterns. The decision not to supplement an EIS based on a land development *proposal* is not unreasonable.

5. *Impact on Lifestyles.* Plaintiff contends that the EIS fails to mention the project's effect upon the lifestyles of those living on the rural Waianae coast. As stated in the Corps' 1976 EIS, "[g]rowth can be viewed as adverse or beneficial." The urbanization plaintiff views as adverse has been adequately addressed by the Corps.

■■■ 6. *Designation of the 'akoko plant as an endangered species.* The plant's existence in the harbor area and proposed endangered status were indicated in the 1976 EIS. Upon official designation as an endangered species, the Corps initiated consultation with the Fish and Wildlife Service and has complied with the require-

ments of the Endangered Species Act (*see* discussion *supra* Part I). In view of the Corps' compliance with that act and the fact that only 2% of the known 'akoko population exists in the harbor vicinity, the Corps' decision not to supplement its EIS is reasonable.

### III. *Water Resources Development Act*

Plaintiff also claims that the Corps invalidly applied a 3¼ percent discount rate in its cost-benefit computations for the Barbers Point harbor project.

The Water Resources Development Act of 1974 (WRDA), 42 U.S.C. § 1962–17, specifies the discount rate formula to be used by federal agencies in calculating the present value of water resource projects. The formula is to be applied to "plan formulation and evaluation" of such projects as the Barbers Point Harbor. *Id.* § 1962d–17(a). The Corps, therefore, applied the WRDA discount rate formula both in the cost benefit-analysis submitted to Congress for approval of the project and in its Environmental Impacts Statements, *see Johnston v. Davis*, 698 F.2d 1088, 1092 (10th Cir.1983) (WRDA discount rate formula is applicable to EIS).

Under the WRDA and regulations promulgated thereunder, the Corps is required to use a current discount rate determined by a formula and published by the Water Resources Council. 42 U.S.C. § 1962d–17(b); 18 C.F.R. § 704.39 (1984). For projects authorized by Congress prior to January 3, 1969, as was the harbor project, the Corps may use a 3¼% rate if the appropriate non-federal agencies have, prior to December 31, 1969, given "satisfactory assurances" to pay the required non-federal share of the project costs. 42 U.S.C. § 1962d–17(b); 18 C.F.R. § 704.39(d).

Enos contends that the Corps did not receive the required "satisfactory assurances" from state authorities, and therefore may not base future cost-benefit calculations upon the 3¼% rate.[12] Although un-

---

12. Plaintiff contends that the Corps should be required to use the 1983 discount rate of 7⅞ percent, which would provide a more accurate

clear in his presentation, plaintiff appears to claim that the Corps violated both NEPA and the WRDA by using the low discount rate. Enos apparently alleges that by using the low discount formula in cost-benefit calculations in the 1976 EIS and 1977 Supplement, the Corps submitted an inadequate EIS and violated NEPA. He also alleges that the Corps violated the WRDA by applying the 3¼ rate in cost-benefit analysis submitted to Congress to aid the legislature in its decision to authorize and fund the harbor project.

 Violations, based upon invalid use of the WRDA discount rate formula under NEPA and the WRDA are distinct. From the record of the pleadings below, it is clear that Enos challenges the use of the 3¼ percent discount rate in the EIS for the first time on appeal.[13] We decline to entertain this challenge at this stage in the proceedings.[14] *Taylor v. Sentry Life Ins. Co.*, 729 F.2d 652, 655–56 (9th Cir.1984).

 A principal purpose of the WRDA is to provide Congress and the Corps with accurate data by which to evaluate water resource projects such as the Barbers Point Harbor. *See Environmental Defense Fund v. Marsh (EDF)*, 651 F.2d 983, 1000 (5th Cir.1981).[15] The WRDA does not establish a specific right to judicial review of agency action, and thus a plaintiff must seek review of a violation under the Administrative Procedure Act, 5 U.S.C. § 702. *EDF*, 651 F.2d at 1003. Several courts have reviewed agency action under the "ar-

bitrary and capricious standard," *e.g., Izaak Walton League of America v. Marsh*, 655 F.2d 346, 362 (D.C.Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981), and have adopted an "objective test" to determine whether a state has given the required "satisfactory assurances," *State of Alabama ex rel. Baxley v. Corps of Engineers*, 411 F.Supp. 1261, 1272 (N.D.Ala.1976). Plaintiff concedes that congressional action based upon a specific cost-benefit analysis forecloses judicial review of that analysis, *EDF*, 651 F.2d at 1006; *Izaak Walton League of America*, 655 F.2d at 357–58, *South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1013 (5th Cir.1980). Therefore he only contends that he is entitled to prospective relief ordering the Corps to refrain from using the invalid discount rate in future cost-benefit analyses. *EDF*, 651 F.2d at 1006.

 In order for this court to review past agency action and order the requested relief, a plaintiff must first establish standing under the APA, 5 U.S.C. § 702. *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *EDF*, 651 F.2d at 1003. Enos, therefore, must allege some "injury in fact" and must allege that the injury is "arguably within the zone of interests to be protected or regulated by the statute[ ] that the [agency is] claimed to have violated." *Sierra Club v. Morton*, 405 U.S. at 733, 92 S.Ct. at 1365 (citation omitted); *EDF*, 651 F.2d at 1003.

---

representation of the project's costs and benefits in future economic analyses.

**13.** Throughout the pleadings and memoranda, plaintiffs challenge the discount rate as a violation of the WRDA, not the NEPA. In its lengthy and thorough order, the district court only addressed the propriety of the use of the discount rate under the WRDA, and not under NEPA.

**14.** We do note that in its 1976 EIS, the Corps also included a cost-benefit ratio based upon the discount rate of 6⅜ percent, thereby fulfilling the substantive purpose of NEPA to inform decision-makers and the public of the realistic consequences of agency action. *See Johnston v. Davis*, 698 F.2d at 1094–95.

**15.** The WRDA was enacted in 1974, P.L. 93–251. While there is no reported legislative history of the Act, it appears as if the relevant provision, section 1962d–17(b) of Title 42, codified an earlier regulation issued by the Water Resources Council, 18 C.F.R. § 704.39 (1965). The Council was created under the Water Resources Planning Act of 1965 to establish "principles, standards, and procedures" for the "formulation and evaluation of federal water projects," 42 U.S.C. § 1962a–2, and aids Congress in evaluating various water resource projects. *See* H.Rep. No. 169, 89th Cong., 1st Sess. 3, 5 (1965) U.S.Code Cong. & Admin.News 1965, 1921; *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 356–57 (D.C.Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

The Supreme Court has indicated that courts should not be restrictive in granting standing under the APA to challenge agency action taken pursuant to a statute. *Sierra Club v. Morton*, 405 U.S. at 754–55, 92 S.Ct. at 1375–76. However, in the instant case, Enos has presented no facts that actual injury would occur if the Corps were to continue to use the lower discount rate. Enos' assertion that it is possible that use of a higher discount rate would drop the level of economic justification of the harbor project so that the Corps would be required to place the project on a deferred status because of the project's marginal or doubtful economic justification is conclusory only. Engineer Regulation 11–2–240 §§ 6 and 13(a)(2)–(3). *Compare EDF*, 651 F.2d at 1003–04 (plaintiffs had shown there was a significant possibility that higher discount rate under section 1962d–17(a) would place the project on deferred status). Therefore, we hold that Enos has not established standing to bring a claim for relief under the APA for violation of the WRDA and that he is not entitled to relief.

## CONCLUSION

Enos appeals the district court order on claims brought under the Endangered Species Act, the Environmental Policy Act, and the Water Resources Development Act. None of his claims is meritorious. The district court's denial of preliminary injunction to plaintiff and grant of summary judgment to defendants on all claims are therefore affirmed.

AFFIRMED.