RESOURCES LIMITED, INC.; Swan View Coalition, Inc.; Friends of the Wild Swan; and Five Valleys Audubon Society, Plaintiffs–Appellants,

v.

F. Dale ROBERTSON, John Mumma; Edgar G. Brannon, Jr., Defendants–Appellees,

and

Intermountain Forest Industry Association, Defendant–Intervenor–Appellee.

No. 92–35047.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1993.

Decided Nov. 3, 1993.

As Amended on Denial of Rehearing July 5, 1994.

Daniel J. Rohlf, Portland, OR, for plaintiffs-appellants.

Martin W. Matzen, Gary B. Randall, Anthony P. Hoang, and Robert L. Klarquist, U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Thomas R. Lundquist and Steven P. Quarles, Crowell and Moring, Washington, DC, for defendant-intervenor-appellee.

Before WRIGHT, BEEZER, and HALL, Circuit Judges.

BEEZER, Circuit Judge:

Plaintiffs (hereafter "Resources Limited") challenge the Flathead National Forest Land and Resource Management Plan ("Plan") and the forest-wide Environmental Impact Statement ("EIS"). Resources Limited asserts the defendants ("Forest Service") violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act, and the Endangered Species Act. Intervenor Intermountain Forest Industry Association submitted additional briefing on behalf of the Forest Service. We affirm in part and reverse in part the district court's grant of the Forest Service's motion for summary judgment.

## I

Several threatened or endangered species, including the grizzly bear, the gray wolf, the bald eagle, and the peregrine falcon, live in the Flathead National Forest ("the Forest") in northern Montana. The Forest Service has been involved in developing the Plan and EIS for the Forest to accommodate these species, while allowing logging and other uses, since the early 1980s. The Forest Service issued the Plan and the EIS in 1985 and approved them in 1986.

Resources Limited criticized the EIS as inadequate and disputed the Forest Service's conclusion that implementation of the Plan would not jeopardize the survival of listed species. After exhausting its administrative appeals, Resources Limited brought suit in the district court. The district court determined Resources Limited had no standing and that the matter was not ripe for adjudication. The court also granted the Forest Service summary judgment on all claims. 789 F.Supp. 1529.

## II

We review de novo the district court's holding that Resources Limited has no standing. *Benally v. Hodel*, 940 F.2d 1194, 1198 (9th Cir.1990).

Resources Limited must demonstrate that it satisfies three essential elements of standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely" as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[1]

*Lujan v. Defenders of Wildlife ("Defenders")*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted) (all editing in original).

The district court determined its decision on standing was controlled by its decision in *Idaho Conservation League v. Mumma*, No. CV–88–197–M–CCL, 1990 WL 300860 (D.Mont. August 7, 1990), *rev'd*, 956 F.2d 1508 (9th Cir.1992). There, the district court held that the plaintiff had not shown that it was injured in fact. The injury was "too remote and [could not] be directly tied to the plan adopted by the Forest Service" since later, site-specific actions would also require the preparation of an EIS. As Resources Limited, too, was challenging a Plan "that merely allowed for the possibility of development in the future," the district court held that Resources Limited had failed to show that it was injured in fact.

We reversed the district court in *Idaho Conservation League v. Mumma ("Mumma")*, 956 F.2d 1508 (9th Cir.1992). We recognized that the initial plan, though not site-specific, is an "important decision[ ]." *Id.* at 1516 ("Indeed, short of assuming that Congress imposed useless procedural safeguards, ... we must conclude that the management

---

1. The district court's determination that Resources Limited lacked standing was based only on the absence of an injury in fact. As to the second and third elements, Resources Limited's injury in fact is fairly traceable to the challenged action of the defendant, and is likely to be redressed by a favorable decision. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517–18 (9th Cir.1992).

plan plays some, if not a critical, part in subsequent decisions."). We also noted that, if plaintiffs did not have standing to challenge a non-site-specific EIS, the program as a whole could never be reviewed. "To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge." *Id.* at 1516.

The Forest Service suggests that two recent Supreme Court cases, *Defenders* and *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), call *Mumma* into question.[2] *National Wildlife* was handed down before *Mumma*, and was in fact cited in *Mumma*. We have just decided two cases affirming the continuing validity of *Mumma* in light of the two Supreme Court cases. In *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699 (9th Cir. 1993), we addressed whether the Seattle Audubon Society had standing to "challenge[ ] the Forest Service's Final EIS and Record of Decision adopting the Interagency Scientific Committee's Report as the Forest Service's spotted owl management plan." *Id.* at 701. We rejected the Forest Service's view that the Supreme Court cases "materially alter the standing principles which previously applied" as "not well-founded." *Id.* at 702. In *Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705 (9th Cir.1993), which concerned the Secretary of the Interior's decision not to supplement timber management plans with new information, we rejected the Forest Service's argument that the two Supreme Court cases "establish a new, stricter burden on plaintiffs to establish with specificity an injury-in-fact caused by a challenged government action." *Id.* at 707.

Though the plaintiffs "filed various affidavits from members of their associations and organizations which state that the particular member visits and uses the Flathead National Forest on a regular basis, and that their use and enjoyment of the Forest will be inhibited and affected by the adoption" of the Plan, the intervenor contends Resources Limited's inability to point to the precise area of the park where their injury will occur indicates Resources Limited has no standing. We have not imposed any such requirement of specificity. *Espy*, 998 F.2d at 702–03; *Mumma*, 956 F.2d at 1516–17. We have also rejected the argument that the injury is "conjectural or hypothetical" because there may be "as yet unknown intervening circumstances." *Espy*, 998 F.2d at 703; *Mumma*, 956 F.2d at 1515.

We reverse the district court's holding that Resources Limited does not have standing.

### III

■ Relying on *National Wildlife*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the district court held that this dispute was not ripe for review because no "concrete action implementing the plan" was imminent. In *Mumma*, after considering *National Wildlife*, we addressed and rejected this same argument. 956 F.2d at 1518–19. Our two most recent pronouncements on this subject are in accord with *Mumma*. In *Espy*, we rejected the argument that the Seattle Audubon Society's challenge to the Forest Service's management plan would not be ripe "until the Service authorizes a specific timber sale pursuant to the plan, because only a specific timber sale would harm either the plaintiffs or the owls." *Espy*, 998 F.2d at 703. The opinion states:

In *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir.1992), we ex-

---

**2.** The Forest Service also attempts to distinguish *Mumma* on the basis that the court's standing inquiry there hinged on the fact that the case concerned roadless areas. On the contrary, the court determined the injury, in essence, was the "alleged procedural failure in the EIS (the actual, present harm) that 'create[d] a risk that environmental impact [would] be overlooked' (in the future)." *Id.* at 1514. *Id.* ("[T]he right claimed by appellants is, among others, the right to have agencies consider all reasonable alternatives before making a decision affecting the environment, as required by NEPA. The harm alleged by the [plaintiff] is thus one that Congress—by virtue of imposing NEPA's procedural requirements—has acknowledged."). This is still true after *Defenders*. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir.1993). The *Defenders* Court did not hold that a person cannot enforce procedural rights. Rather, it said that he or she can do so if "the procedures ... are designed to protect some threatened concrete interest ... that is the ultimate basis of ... standing." *Defenders*, —— U.S. at —— n. 8, 112 S.Ct. at 2143 n. 8.

pressly recognized that individual timber sales are driven by an underlying owl-management plan, and in *Idaho Conservation League,* we held that plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan. 956 F.2d at 1519.

*Id.* at 703. *See also Babbitt,* 998 F.2d at 708 ("the decision [not to supplement Timber Management Plans] is ripe for review now rather than when individual sales are announced because, to the extent these [plans] pre-determine the future, the Secretary's failure to comply with NEPA represents a concrete injury that would undermine any future challenges by plaintiffs"). This case is ripe for review.

## IV

Under 5 U.S.C. § 706(2)(A), the federal courts have the authority to "hold unlawful and set aside" agency actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The district court must determine whether the Forest Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy,* 898 F.2d 1410, 1414 (9th Cir.1990) (citations omitted). We review de novo the court's decision. *Id.*

The Forest Service must consult the Fish and Wildlife Service ("FWS") so the FWS can prepare a biological opinion assessing the likely impact of the proposed actions on any threatened or endangered species. 16 U.S.C. § 1536. The Forest Service must provide the FWS "with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review." 50 C.F.R. § 402.14(d). The FWS concluded that the Plan was not likely to jeopardize the continued existence of any listed species. The Forest Service made the same conclusion.

Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act. *Pyramid Lake,* 898 F.2d at 1415. An agency cannot "abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious." *Id.* The FWS in its opinion did not confirm the Plan was consistent with the Interagency Grizzly Bear Guidelines of 1986 (hereafter "Grizzly Guidelines"); [3] rather, it conditioned its "no jeopardy" conclusion on the Forest Service's continued adherence to the Guidelines. FWS Biological Opinion Amendment, July 18, 1989, at 24. In fact, the FWS explicitly anticipated that departures from the Guidelines may occur. *Id.* at 23–24 ("While the Forest Plan projects an annual harvest of 100 MMBF on 66,000 acres over the first decade and 500 miles of roads constructed in association with the timber harvest, these outputs may not be achieved due to the constants [sic] of the grizzly bear standards and Guidelines.").

We have stated that "even when the FWS's opinion is based on 'admittedly weak' information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no 'new' information—i.e., information the [FWS] did not take into account—which challenges the opinion's conclusions." *Pyramid Lake,* 898 F.2d at 1415. Resources Limited argues that the Forest Service's reliance on the FWS opinion was arbitrary and capricious because the Forest Service selectively withheld from the FWS information concerning the impacts of timber harvesting on grizzlies. For example, a Forest Service interdisciplinary team study outlined problems with reconciling high levels of timber harvesting with the Guidelines. The interdisciplinary team concluded that at maximum 97.2 mmbf/year of timber could be cut without likely adverse impact on the grizzly population. The Flathead District rangers report-

---

3. The Forest Service set out management techniques for the grizzly bear in the "Grizzly Guidelines." Though the FWS made its "no jeopardy" conclusion contingent on adherence to the Guidelines, and the Regional Forester was directed to amend the Plan to be consistent with the Guidelines, the Forest Service still argues that the Guidelines are somehow optional because they are not necessary for *survival* of the grizzly, just for recovery. According to the Grizzly Bear Recovery Plan, application of these Guidelines to the Northern Continental Divide Ecosystem is necessary "to prevent extinction" of the species.

ed that no more than 93 mmbf/year could be cut without likely adverse impact.

The Forest Service defends its conclusion that listed species would not be jeopardized even at timber harvest levels averaging 100 mmbf/year by emphasizing that the figure is a "maximum" and that when site-specific decisions are made certain planned sales may have to be cancelled because of danger to grizzlies. The EIS glossary defines the timber harvest level (referred to as the "allowable sale quantity" (ASQ)) as "the quantity of timber that may be sold from the area of suitable land covered by the Forest Plan for a time period specified by the plan." The fact that the annual ASQ sets the *maximum* timber harvest in a given year does not mean that the number can be drawn out of a hat. According to the Plan itself, the "Plan guides all natural resource management activities and establishes management standards for the ... Forest. It describes resource management practices, levels of resource production and management, and the availability and suitability of lands for resources management. The purpose of the Forest Plan is to provide long-term direction for managing the ... Forest." Proper determination of the ASQ, perhaps more than any other element of forest-wide planning, is critical in providing "long-term direction." It is necessary not just to help the Forest Service carry out its mandate to preserve the grizzly bear from extinction but also to allow both the Forest Service and private parties to plan their operations. We recognize that further consultation with the FWS will occur in the event of later, unforeseen conflicts. While imperative, this consultation procedure does not excuse the Forest Service's arbitrary and capricious selection of an unattainable ASQ.

The Forest Service acted arbitrarily and capriciously in concluding, on the record as a whole, that the Plan would not jeopardize listed species even at timber harvest levels of 100 mmbf/year. The Forest Service's own studies raise serious questions about the effects on the grizzly bear at the 100 mmbf/year harvest level. The Forest Service's reliance on the FWS's opinion was not justified

in light of its failure to provide the FWS with all of the data and information required by 50 C.F.R. § 402.14(d).

**V**

All of the ensuing sections (V–VIII) involve challenges to the adequacy of the EIS. In reviewing the adequacy of an EIS,

[t]his circuit employs a 'rule of reason' that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. A reviewing judge must make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.... Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end.

*Mumma,* 956 F.2d at 1519 (citations and quotation marks omitted).

Resources Limited contends the EIS did not adequately address the cumulative impact[4] of non-Federal actions on the grizzly bears. There are 270,000 acres of state and private land within the forest boundaries. Some of this land provides extremely important habitat for the grizzly bears.

The district court held that the Forest Service must consider cumulative impact only in the "scoping" stage, and not within the EIS itself. *See Citizens for Environmental Quality v. United States,* 731 F.Supp. 970, 995 (D.Colo.1989). We have held repeatedly that the Forest Service is required to address cumulative impacts in the EIS. *See, e.g., City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990); *Oregon Natural Resources Council v. Marsh,* 832 F.2d 1489, 1498 (9th Cir.1987), *rev'd on other grounds,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Thomas v. Peterson,* 753 F.2d 754, 759 (9th Cir.1985). As the Forest Service recognized in its brief, the EIS "is, by its very nature, a cumulative impacts analysis document."

4. "Cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future

actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

The Forest Service says that cumulative impacts from non-Federal actions need not be analyzed because the Federal government cannot control them. That interpretation is inconsistent with 40 C.F.R. § 1508.7, which specifically requires such analysis. Nor is the regulation impossible to implement, unreasonable or oppressive: one does not need control over private land to be able to assess the impact that activities on private land may have in the Forest.

While the regulation requires that the Forest Service must consider non-Federal cumulative impacts, it does not specifically require that the impacts be addressed at the programmatic level. We have "held that where several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS." *Tenakee Springs,* 915 F.2d at 1312. In *LaFlamme v. FERC,* 852 F.2d 389, 401–03 (9th Cir.1988), we emphasized that agency consideration of specific projects in isolation is insufficient to replace analysis of the impact of a program as a whole. We do not require consideration of non-Federal cumulative impacts in this programmatic EIS, on the condition that the Forest Service must analyze such impacts, including possible synergistic effects from implementation of the Plan as a whole, before specific sales.

Resources Limited also claims the EIS inadequately addresses the cumulative impacts of reasonably foreseeable road construction. We conclude that the EIS contains a "reasonably thorough discussion" of these impacts. The Forest Service considered properly the effects of different levels of road construction. The Forest Service also says that it is preparing an EIS that will address more fully the impact of additional road construction.

## VI

Resources Limited attacks the EIS as inadequate because it does not provide the "nature, extent, and location of the Plan alternatives' impacts on water quality and fish." The discussion of alternatives in the EIS must "foster[ ] informed decisionmaking and informed public participation." *Mumma,* 956 F.2d at 1519. Resources Limited suggests that without more specific data neither the Forest Service nor the public can make an informed decision among the alternatives. They also contend the Forest Service needs more specific data to ensure that water quality will comply with statutory minima.

The EIS considered extensively water quality, sediment levels, and potential effects on "management indicator species." "Best management practices" are to be used to ensure water quality is maintained and state water quality standards satisfied. The comparative analysis of water quality impacts under each alternative was adequate to allow Forest Service decisionmakers and the public to make an informed choice among the alternatives. The Forest Service satisfied the requirement that "[p]lanning alternatives … be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(2).

In insisting on more specific water quality data, Resources Limited relies in part on *Northwest Indian Cemetery Protective Ass'n v. Peterson,* 795 F.2d 688 (9th Cir.1986), *rev'd on other grounds,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). That case concerned a site-specific, not forest-wide, plan. *Id.* at 696–97. We are convinced that such specific analysis is better done when a specific development action is to be taken, not at the programmatic level. The analysis will be conducted before each particular project, and projects not found to meet Montana water quality standards "will be redesigned, rescheduled, or dropped."

## VII

The Forest Service is charged to "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). *See also* 36 C.F.R. § 219.12(f)(1) ("Alternatives shall be distributed between the minimum resource potential and the maximum resource potential to reflect to the extent practicable the full range of major commodity and environmental resource uses and values that could be produced from the forest.

Alternatives shall reflect a range of resource outputs and expenditure levels.").

 The "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Mumma*, 956 F.2d at 1519 (citation omitted). An agency's consideration of alternatives is adequate "if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180–81 (9th Cir.1990).

 Resources Limited contends that the Forest Service did not consider an adequate range of timber harvest alternatives, because the Forest Service failed to consider timber harvest levels that were substantially lower than existing harvest levels. Resources Limited suggests that, in computer modelling the different alternatives, the Forest Service skewed the model's calculations by imposing a parameter that the harvest level remain at or near current levels.

"The Forest Service [i]s entitled to identify *some* parameters and criteria—related to Plan standards—for generating alternatives to which it would devote serious consideration. Without such criteria, an agency could generate countless alternatives." *Mumma*, 956 F.2d at 1522. Here the Forest Service did not, as in *California v. Block*, 690 F.2d 753, 767 (9th Cir.1982), "consider only those alternatives with [the same] end result." Of the 17 alternatives considered, five were based on timber harvest levels more than 18 percent lower than existing levels. One alternative was based on a projected average ASQ of 51 mmbf/year.

We hold that the Forest Service considered an adequate range of timber harvest levels for the first decade of the Plan. We do not address the range of timber harvest levels for subsequent decades, as we are advised that the EIS is to be revised every 10 years.

## VIII

 Resources Limited asserts that no Plan alternative allocates less than 75% of harvest to even-aged cutting, and that the range of alternatives the Forest Service considered was therefore inadequate. Resources Limited suggests that the Forest

Service should have included one or more alternatives which were based primarily on uneven-aged cutting.

 The district court concluded correctly that the Forest Service considered adequately a broad range of harvest method alternatives. Alternatives that are unlikely to be implemented need not be considered, nor "must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters*, 914 F.2d at 1180. The Forest Service considered uneven-aged silviculture and determined that "relatively few stands currently exist with age structures that are suitable for uneven-aged silviculture. Application of uneven-aged silviculture to even-aged stands in the habitat types that comprise most of the ... Forest's timberlands will result in a loss of tree species diversity." The Forest Service cited numerous studies supporting its decision to use mostly even-aged harvest methods, a decision it addressed at length in the EIS. The Forest Service studied thoroughly the harvest method issue and defended its decision to use primarily even-aged techniques as best for the Forest.

Although Resources Limited argues that economic concerns were a factor in the decision to favor even-aged harvest methods, the Forest Service may consider such concerns if the "harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output for timber." 16 U.S.C. § 1604(g)(3)(E)(iv). Resources Limited's focal concern is clearcutting, a harvest method which the Forest Service interdisciplinary team found inconsistent with several types of tree habitats in the Forest. When the EIS or an environmental assessment (EA) for each specific site is drafted, Resources Limited will have the opportunity to challenge that EIS or EA if clearcutting is improperly endorsed as the optimum harvest method.

## IX

We reverse the district court's holding that Resources Limited lacks standing and that this case is not yet ripe for adjudication. We affirm the court's conclusion that the EIS is

adequate. We set aside the Forest Service's determination that implementation of the Plan would not jeopardize the continued existence of listed species.

We remand the case to the district court for remand to the Forest Service. The Forest Service may reinitiate formal consultation with the FWS concerning the current amended Plan. Alternatively, the Forest Service may propose an amendment to the current amended Plan which shall include an amended ASQ. In any event, the Forest Service shall formally consult with the FWS concerning the current or proposed amended Plan and provide it with all the data and information required by 50 C.F.R. § 402.14(d), including, but not limited to, the Interdisciplinary Team and the District Rangers' reports.

After the FWS issues an amended opinion based on its assessment of all the relevant information, the Forest Service must reevaluate its determination that the current or proposed amended Plan would not be likely to jeopardize listed species. The district court will retain jurisdiction over this case to ensure that this process is completed within six months of our mandate.

If the Forest Service concludes that the current or proposed amended Plan will jeopardize listed species, the Forest Service shall again propose a new amendment, subject to the procedures set out above, or amend again the Plan so that it will not be likely to jeopardize listed species.

In any event, if the Forest Service concludes that the current or proposed amended Plan will jeopardize listed species, the district court will retain jurisdiction to ensure that the Forest Service amends the Plan within a year of our mandate.

We leave it to the district court to determine whether to issue a limited preliminary injunction to halt road construction, road reconstruction and clearcutting in grizzly bear habitat during this time.

AFFIRMED in part, REVERSED and REMANDED in part.