**OREGON NATURAL RESOURCES COUNCIL, et al., Plaintiffs,**

v.

**John O. MARSH, Jr., in his official capacity as Secretary of the United States Department of the Army, et al., Defendants.**

**OREGON NATURAL RESOURCES COUNCIL, et al., Plaintiffs,**

v.

**Ernest J. HARRELL, in his official capacity as Commander and Division Engineer, North Pacific Division, Corps of Engineers, United States Department of the Army, et al., Defendants.**

Civ. Nos. 85–6433–BU, 92–1550–BU.

United States District Court, D. Oregon.

Feb. 1, 1994.

As Amended Feb. 10, 1994.

Neil S. Kagan, Portland, OR, for plaintiffs.

Brian L. Ferrell, U.S. Dept. of Justice, Environmental and Natural Resources Div., General Litigation Section, Washington, DC, Thomas C. Lee, U.S. Atty., Portland, OR, for defendants.

Opinion and Order

JAMES M. BURNS, Senior District Judge.

This dam case is back again. Its progress through the judicial system has resulted in

less than half a dam, and, as the caption reflects, a second lawsuit. Plaintiffs seek mandatory injunctive relief ordering the removal of the partially completed dam from Elk Creek. Defendants seek dissolution of the present injunction so that further planning, design, and, ultimately, construction can go forward. Their motions are pending in the older case, *Oregon Natural Resources Council v. Marsh, (Marsh)*. Both sides move for summary judgment under Rule 56(c) and the same injunctive relief in the newer case, *Oregon Natural Resources Council v. Harrell (Harrell)*.

## I. FACTUAL BACKGROUND

For a more complete history, readers may consult one or more of the opinions offered earlier in this case, some of which are cited below. Initially, I found and held that the Corps of Engineers had taken the required "hard look" for NEPA purposes. That was almost eight years ago, in the spring of 1986, when I denied plaintiffs' request for a preliminary injunction. *Oregon Natural Resources Council v. Marsh*, 628 F.Supp. 1557 (D.Or. 1986).

I knew plaintiffs intended to appeal. Therefore, I granted them a short stay to apply to the Ninth Circuit for a stay pending appeal. A panel of the Court of Appeals denied plaintiffs' motion for a stay, and construction of the dam began.

A little over a year later, a different panel of the Court of Appeals found that the Corps had not properly done its NEPA job. The appellate reversal carried with it directions for me to issue an injunction appropriate to the mid-construction circumstances. *Oregon Natural Resources Council v. Marsh*, 832 F.2d 1489 (9th Cir.1987). Accordingly, I issued an injunction requiring the Corps to halt construction before the dam was completed. *Oregon Natural Resources Council v. Marsh*, 677 F.Supp. 1072 (D.Or.1987). In accordance with my ruling, the Corps closed

down the project when the dam structure reached a height of 1,563 feet. This is approximately one third of the planned height of the dam.

Neither side appealed my injunction. However, defendants sought review in the Supreme Court of the ruling by the Court of Appeals on all but one of the NEPA issues. For reasons that still continue to baffle me, the Justice Department lawyers saw fit not to ask for review of the so-called "cumulative impacts" issue. Almost exactly one year after the ruling of the Court of Appeals, the Supreme Court granted certiorari. *Robertson v. Methow Valley Citizens Council*, 487 U.S. 1217, 108 S.Ct. 2869, 101 L.Ed.2d 905 (1988). Just about a year later, the Supreme Court reversed the Court of Appeals on all the issues presented in the appeal. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), *companion case Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).[1]

On February 22, 1990, pursuant to the order from the Court of Appeals, I modified the injunction, prohibiting further construction until the Corps had supplemented its Environmental Impact Statement consistent with the opinions of this court, the Court of Appeals, and the Supreme Court. The net result of those opinions was the Ninth Circuit ruling requiring the Corps to supplement the discussion of cumulative impacts, the issue which had not been appealed to the Supreme Court.

The Corps issued its second supplement to the Environmental Impact Statement (Second EISS) on May 1, 1991. The Division Engineer ("Harrell") issued the final Record of Decision ("ROD") on January 24, 1992, selecting the NCP or "no conservation pool" alternative operating mode. Based on completion of the Second EISS, the Corps moved for dissolution of the injunction on July 22, 1992.[2]

---

1. This stately yearly saga has continued; if the future imitates the past, in another 18 months we will have been at it for a decade. The sharp eyed reader will note that the story began with the authorization of Elk Creek Dam in 1962, in the second year of John F. Kennedy's presidency.

Compared to this case, *Jarndyce v. Jarndyce* was a piker. Charles Dickens, *Bleak House* (1853).

2. In the Energy and Water Development Appropriation Act for Fiscal Year 1993, Public Law 102–377, Congress allocated $2.5 million to the

Meanwhile, the Secretary of the United States Department of Agriculture, acting through Regional Forester Lowe ("Forest Service" or "Lowe") of the United States Forest Service, and the Secretary of the United States Department of the Interior, acting through Director Bibles of the United States Bureau of Land Management ("BLM" or "Bibles"), jointly prepared a "Section 7(a) determination" under the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1278. The Forest Service and BLM issued the Section 7(a) determination on November 5, 1992. In it, they concluded that the partially completed Elk Creek Dam project unreasonably diminishes fishery resources in the Rogue River, a designated Wild and Scenic River under WSRA. They found that the project would continue to unreasonably diminish the WSRA values of the Rogue River if it is completed and operated in the NCP operating mode as presently designed.

## II. STANDARDS

### A. SUMMARY JUDGMENT

The court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party must show that there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp.* 477 U.S. at 322–23, 106 S.Ct. at 2552.

### B. INJUNCTIVE RELIEF

To obtain injunctive relief, the moving party must show irreparable injury and inadequacy of legal remedies. *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987); *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988). For a preliminary injunction, the moving party must show either probable suc-

cess on the merits and the possibility of irreparable injury or serious questions on the merits and the balance of hardships tipping sharply in its favor. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir.1975); *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987); *Half Moon Bay Fishermans' Marketing Asso. v. Carlucci,* 857 F.2d 505, 507 (9th Cir.1988); *Hoopa Valley Tribe v. Christie,* 812 F.2d 1097, 1102 (9th Cir.1986). These two formulations are points on a continuous scale in which the moving party must show a greater likelihood of irreparable harm as its probability of success decreases. *Odessa Union Warehouse Co-op,* 833 F.2d at 174; *Benda v. Grand Lodge of International Asso. of Machinists & Aerospace Workers,* 584 F.2d 308, 314–15 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). The test for a permanent injunction is essentially the same except actual success on the merits must be shown. *Sierra Club v. Penfold,* 857 F.2d at 1318.

## III. DISCUSSION

### A. NEPA

NEPA was enacted as a national policy to accomplish significant substantive environmental goals set forth in 42 U.S.C. § 4321. It imposes upon agencies essentially procedural duties to insure fully informed and well considered decisions on proposed actions with environmental consequences. *See* 42 U.S.C. § 4332; *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980). These procedural duties are implemented by regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. § 1500–08. They include and govern the preparation of an EIS when a proposed action may significantly affect the

---

Corps to conduct engineering and design and to prepare plans and specifications to resume construction on the Elk Creek Project. Congress appropriated $450,000 for the Elk Creek project for Fiscal Year 1994. *See* Energy and Water Development Appropriations Act for Fiscal Year 1994, House Committee Report 103–135.

environment. 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1502.3; *LaFlamme v. FERC*, 945 F.2d 1124, 1128 (9th Cir.1991).

The role of the court in this scenario is to determine whether the EIS was prepared in accordance with these procedural requirements. 5 U.S.C. § 706(2)(D); *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir.1974) (en banc). The court must make a pragmatic judgment whether the form, content, and preparation of the EIS indicates that the agency has taken a "hard look" at the environmental consequences of its proposal. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982). Reexamination of questions of policy, appropriately left to Congress, is beyond the role of the court. *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. at 1219. Likewise, it is not the court's role to substitute its judgment of the probable environmental consequences of a proposed action for that of the agency. *Kleppe v. Sierra Club*, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21.

■ Accordingly, my role is simply to employ a "rule of reason" that inquires whether the EIS, including both supplements, contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. *Marsh v. Oregon Natural Resources Council*, 490 U.S. at 373, 109 S.Ct. at 1859; *California v. Block*, 690 F.2d at 761; *Trout Unlimited, Inc. v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974).

1. THE CUMULATIVE IMPACTS ANALYSIS ON REMAND IN *MARSH*

■ The "cumulative impact" the Corps is required to evaluate is "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. Initially, I ruled that the Corps had adequately described and analyzed the cumulative environmental impact of the Elk Creek Dam as the third and final step in the Rogue River Basin Project. *Marsh*, 628 F.Supp. at 1563.

The Court of Appeals overruled me. In part V of its opinion, the Court ruled that the Corps had not taken a sufficiently hard look at cumulative environmental impacts because in some respects it had considered only the impact of the individual Elk Creek project. *Oregon Natural Resources Council v. Marsh*, 832 F.2d at 1497–98. This ruling was not raised before the Supreme Court. To comply with Part V of the opinion, the Second EISS must consider and discuss the impact of Elk Creek Dam in conjunction with Lost Creek Dam and, if appropriate, Applegate River Dam. I am satisfied that the Corps has now done so.

The Second EISS describes the existing conditions in Elk Creek and in the Rogue River system with the two completed projects, Lost Creek Lake and Applegate Lake. It then describes the predicted effects of completing and operating the Elk Creek project as the third and final step in the Rogue River Basin Project. The discussion includes incremental consideration of the base (pre-dam) conditions, conditions after adding Lost Creek Dam, conditions after adding both Lost Creek Dam and Applegate River Dam, and finally, the predicted effects of Elk Creek Dam related to each alternative for operating the project. The analysis considers the cumulative effects of these projects on streamflows, water temperature, and water turbidity. It uses the same incremental approach to discuss the conditions of and project effects on Rogue River fisheries, wildlife, local recreation, and the local economy.

Plaintiffs contend that the Second EISS does not cure the defects of the original EIS because the areas of discussion do not include each of the potential areas of impact listed in 40 C.F.R. § 1508.8. In the Second EISS, the Corps focused on water quality and fish production based on the two examples used by the Court of Appeals in part V of its opinion to demonstrate the deficiencies of the EIS. *Marsh*, 832 F.2d at 1498. Plaintiffs contend the two examples were not intended to narrow the scope of the discussion. I disagree.

Both examples represent instances where the Corps discussed a particular area of im-

pact in terms of the individual Elk Creek Project, neglecting to discuss one or both of the other two projects. *Id.* Neither example indicates that the Court of Appeals considered the scope of the investigation in the EIS too narrow with respect to the areas of impact discussed. *Id.* Nothing in the opinion indicates any intent to require the Corps on remand to discuss additional topics—only to discuss the combined effects of all three projects on the topics already raised in the EIS and the first supplement (EISS No. 1). *Id.* To the extent that plaintiffs contend the Second EISS should have addressed topics over and above those already identified in the NEPA process, I conclude those contentions are beyond the scope of the remand.[3]

In addition, I find that the Corps has not neglected the contribution of any of the three projects in discussing the effects of flows, temperature changes, turbidity changes, habitat changes, or hatchery releases. Accordingly, I find that defendants have met the requirements of the earlier opinions in *Marsh,* including my remand order of February 22, 1990.

Accordingly, nothing remains to be done in *Marsh* and the case should now be dismissed.

## 2. NEW SIGNIFICANT INFORMATION

The scope of the Second EISS was defined by the opinion of the Court of Appeals and my remand order, together with the scoping process. Defendants had no duty arising from the order of remand to exceed that scope. However, the remand did not entitle defendants to ignore compliance with NEPA in other respects.

NEPA and the CEQ regulations, independently of the requirements of the remand order, require an agency to supplement its EIS to take into consideration any "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

An agency need not supplement its EIS every time new information comes to light after the EIS is finalized. However, an agency must continue to take a "hard look" at the environmental effects of its planned action, even after a proposal has received initial approval. *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 373–74, 109 S.Ct. at 1859; *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1176–77 (9th Cir.1990), *rehearing, en banc, denied,* 940 F.2d 435. (9th Cir.1991). The agency must evaluate new information and make a reasoned determination whether it is sufficiently significant to require formal supplementation under NEPA. *Stop H–3 Asso. v. Dole,* 740 F.2d 1442, 1463–64 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). Its decision not to supplement will be upheld if it is reasonable. *Enos v. Marsh,* 769 F.2d 1363, 1373 (9th Cir.1985).

The reasonableness of an agency's decision not to supplement depends on "such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data." *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir.1980); *Stop H–3 Asso.,* 740 F.2d at 1464.

The court plays the limited role of determining under the foregoing standards whether the new information is so significant that it would be irresponsible, arbitrary and capricious for the agency not to act on it. *Wisconsin v. Weinberger,* 745 F.2d 412, 420 (7th Cir.1984). It is not the court's role to resolve the merits of any scientific issues. *Id.* at 420. However, it must determine whether the new information presents a "seriously different picture of the likely environmental consequences of the proposed action" than the picture already considered. *Id.* at

---

**3.** On this basis I reject plaintiffs' contentions that the remand required discussion of: (1) the water quality characteristics listed in OAR 340–41–365; (2) the "sensitive" status of certain fish species in the Rogue River system; (3) the condition of the aquatic invertebrate population in the Rogue River system; and (4) the economic value of Rogue River fisheries to commercial ocean fisheries.

420; *Marsh,* 490 U.S. at 374, 109 S.Ct. at 1859. Resolution of this dispute involves primarily issues of fact requiring deference to the informed discretion of the responsible agency. *Marsh,* 490 U.S. at 377, 109 S.Ct. at 1861.

■■■ Plaintiffs' contentions rest on the information contained in two documents. In the first of these, the Endangered Species Committee of the American Fisheries Society reported in 1991 ("AFS document") that wild coho salmon and summer steelhead trout are in danger of extinction[4] in the Rogue River and in Elk Creek. The AFS document attributed the decline in native stocks of wild coho largely to the present and threatened loss of spawning and rearing habitat. It also reported that negative interactions with hatchery fish had contributed detrimental effects on wild stocks, particularly coho salmon. The AFS document attributed summer steelhead declines largely to other factors, such as ocean survival factors, but also found that habitat damage and detrimental impacts of interactions with hatchery fish contributed significantly. The AFS cited studies of the effects of hatchery interactions with wild runs in other streams to corroborate that hatchery propagation can be a strongly counterproductive mitigation measure.

The AFS document proposed measures to facilitate fish passage to increase natural spawning, protection and restoration of natural habitat, and curtailment and regulation of hatchery propagation to preserve the integrity of wild populations.

The second document is the Section 7(a) determination jointly prepared by the BLM and the Forest Service. It concluded that the Elk Creek Dam, in its present unfinished state unreasonably diminishes the anadromous fisheries of the Rogue River because it impedes migration and makes inaccessible miles of suitable spawning and rearing habitat of wild coho salmon and steelhead trout above the dam.[5] The report found that full and undelayed passage during all critical times is essential considering the depressed state of wild coho stocks. It notes that, although the Corps of Engineers is committed to solving the passage problem, it has thus far only determined that limited passage may be feasible with the No Conservation Pool (NCP) operating mode. In essence, the Section 7(a) determination concluded that, if operated in the NCP operating mode as it is presently designed, the completed dam will not provide an acceptable level of fish passage. Thus, it will continue to unreasonably diminish the fisheries resource of the Rogue River.

The report found that, even assuming passage were achieved, the dam would destroy some valuable upstream spawning and rearing habitat over time, even without a conservation pool. This would include the low-gradient habitat immediately above the dam which is ideal for coho spawning.

The Section 7(a) determination also noted new science which shows that interbreeding of hatchery fish with wild fish weakens the long term genetic viability of the wild stocks. On this basis, the determination disagrees with the assumption underlying the project that loss of habitat can be mitigated by the operation of hatcheries.

Applying the standards of *Warm Springs Dam Task Force* and *Stop H–3 Asso.,* first, I

---

4. The AFS document rated Rogue River wild coho at "high risk of extinction"—having a persistent negative production rate of fewer than one adult fish returning to spawn from each parent spawner and having recent escapements of less than 200. This corresponds to the threshold for listing as "endangered" under the Endangered Species Act ("ESA"). The National Marine Fisheries Service ("NMFS") considers 200 returning adults to be necessary to avoid irreversible genetic losses. Elk Creek coho salmon and Rogue River summer steelhead were rated at "moderate risk of extinction"—having a declining production rate of approximately one adult returning per parent spawner and recent escapements above 200. This corresponds to the threshold for listing as "threatened" under the ESA. Listing under the ESA is the responsibility of the Secretary of Commerce through the NMFS. Neither wild coho nor summer steelhead are presently listed.

5. Elk Creek has historically supported large wild coho and steelhead runs and is a significant part of the remaining productive habitat for these wild fish stocks in the Upper Rogue Basin. The Section 7(a) report shows that approximately 27 miles of Elk Creek is suitable habitat for coho spawning and rearing; approximately 55 miles is suitable for summer steelhead.

conclude that the AFS document and the Section 7(a) Determination contain significant information that has not adequately been considered by defendants in the NEPA process.

I reject defendants' contention that these matters have adequately been considered. Defendants contend the precarious position of the Rogue River fisheries is adequately discussed in the Fisheries Evaluation section of the Second EISS (Appendix C). That section notes the general decline of wild coho in the Rogue River relative to other species since the early 1900s. It also notes that in 1961, numerous coho and steelhead spawned above the site of the Elk Creek project and that few, if any, spawn there now. It candidly states that operation of Elk Creek Dam with any conservation pool will extirpate native Elk Creek coho and steelhead populations. However, it does not consider the information that the NCP operating mode, as presently designed, will extirpate these runs. In addition, there is no discussion of the relationship between the potential extirpation of the Elk Creek fisheries and the viability of the Rogue River coho salmon and summer steelhead fisheries. In light of the AFS information regarding the drastic extent of native Rogue River coho and summer steelhead depletion, this issue should be addressed.

I find defendants have not adequately considered the information on fish passage contained in the joint BLM/Forest Service document. The Second EISS concludes that "passage may be feasible 77—91% of the time" while the dam is operated in the NCP mode. Coho and summer steelhead migration would be limited by flow velocity through the dam. However, there is no discussion of how this limited passage will affect the coho and summer steelhead fisheries— there is no evaluation of whether limited passage will be sufficient to sustain these stocks in Elk Creek or in the Rogue River. In light of the BLM/Forest Service conclusion that full undelayed passage is necessary to sustain these runs, this issue should be addressed.

In addition, defendants did not present information to support the conclusion that "passage may be feasible". Defendants argue that they will develop critical information regarding a permanent fish passage solution if directed to proceed with design. I am satisfied that this information must be developed to comply with the "hard look" requirement of NEPA with respect to the NCP operating mode.

I find defendants have not adequately considered the information on spawning and rearing habitat contained in the two documents. In fact, the Second EISS concedes that habitat information is an important underlying variable that has been ignored. In light of the AFS and BLM/Forest Service conclusions that coho and steelhead fishery declines are attributable largely to loss of habitat, that the completed dam will destroy upstream habitat, and that 44% of the spawning habitat for upriver coho is in the area above Elk Creek dam, there should be discussion of the probability of the potential loss of habitat, its likely extent, and how the Elk Creek and Rogue River fisheries are likely to be affected, assuming passage is achieved.

I find that defendants have not adequately considered the information on negative interactions of hatchery fish with native stocks. The Second EISS states that fish losses from inability to migrate past the dam or from lost habitat will be mitigated by hatchery releases. The EISS notes that there is potential for interactions between wild stocks and hatchery releases which are not understood. However, the AFS and BLM/Forest Service documents contend that "updated science" now shows that these interactions have a detrimental overall effect on the genetic viability of wild stocks, that declines in native coho runs are largely a by-product of successful hatchery programs, and that hatchery programs on other streams are now recognized as a major threat to native fish runs along with loss of habitat. The nature and effects of interactions between native and hatchery fish have not been considered in the NEPA process.

■ Continuing with the standards of *Warm Springs Dam Task Force* and *Stop H–3 Asso.*, I next conclude that the information in the two documents is probably accurate. The conclusions in both documents are

based on data from studies conducted by state and federal agencies with jurisdiction and expertise. In addition, the conclusions are not disputed by defendants, though their legal consequences are.

I conclude that the Corps failed to use reasonable care in evaluating the information in the AFS and BLM/Forest Service documents and failed to support their decision not to supplement with a statement of explanation or additional data. The Corps had a duty to take a hard look at the proffered evidence and to assess the significance of the information contained in the two documents. *Marsh,* 490 U.S. at 385, 109 S.Ct. at 1865.

 I do not rule that another full supplement to the EIS is required. Careful scientific analysis might show that the information in the documents does not warrant full formal supplementation. However, even if such analysis leads defendants to the conclusion that they need not prepare an additional supplement, they must explain why such an undertaking is not necessary or feasible. *See* 33 C.F.R. § 230.11(d) (1987); 40 C.F.R. § 1502.22 (1992); *Marsh,* 490 U.S. at 379 and 385, 109 S.Ct. at 1862 and 1865. Defendants must demonstrate that they have made a reasoned evaluation of the relevant information. This they have not done.

### B. WSRA

WSRA was enacted to implement a national policy to preserve in free-flowing condition certain specified rivers with outstandingly remarkable values. 16 U.S.C. § 1271. The Rogue River was one of eight rivers initially designated in the original Wild and Scenic River legislation in 1968. 16 U.S.C. § 1274(a)(5).

Like NEPA, WSRA imposes on agencies procedural duties to facilitate well informed decisions regarding projects that may conflict with its policy. 16 U.S.C. § 1278(a). Because designated rivers are typically administered by the Secretary of Agriculture through the management authority of the Forest Service,[6] these procedural duties are implemented and governed by Forest Service, USDA Regulations. 36 C.F.R. § 297.1 et seq.

In addition to these procedural duties, WSRA prohibits any department or agency of the United States from assisting "in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established." 16 U.S.C. § 1278(a). Assistance to a development above or below a designated river or on a stream tributary thereto is not precluded, so long as the development will not "unreasonably diminish" the values for which the river was designated. *Id.* Whether a development will affect the values for which a river was designated is to be "determined by the Secretary charged with its administration." *Id.* This determination of the effects of a project is to be made in compliance with NEPA. 36 C.F.R. § 297.-6(a).

Plaintiffs contend that the Corps violated both the procedural requirements of WSRA and its prohibition against assisting a development which unreasonably diminishes the wild and scenic river values of a designated river. They also contend that the Forest Service and BLM violated WSRA by arbitrarily and capriciously preparing the Section 7(a) determination.

### 1. ACTIONS OF THE FOREST SERVICE AND BLM

 Plaintiffs contend that the Forest Service and BLM violated WSRA in their preparation of the Section 7(a) determination. First, they contend Director Bibles and Regional Forester Lowe improperly considered only the NCP alternative rather than all operating alternatives for the Elk Creek project. Second, they contend that their joint determination improperly concluded that when successful fish passage is achieved, the project will not unreasonably diminish Rogue River fish values, contrary to the opinions of their own experts at the drafting

---

6. Congress left the decision of management authority for the Rogue River to the Secretaries of Interior and Agriculture. 16 U.S.C. § 1274(a)(5). The BLM administers the upper

47 miles of the designated section, while the Forest Service administers the lower 37 miles which flow within the Siskyou National Forest.

stage. Those opinions indicated that Elk Creek Dam would eliminate suitable upstream habitat.

Plaintiffs assert I must set aside the Section 7(a) determination if I find it "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants contend that I lack jurisdiction to review it at all. In their view, the Section 7(a) determination is "agency action . . . committed to agency discretion by law" not subject to judicial review under 5 U.S.C. § 701(a)(2). Section 701(a)(2) states a "very narrow exception" to the general mandate of the Administrative Procedure Act that government action be subject to judicial review. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Rank v. Nimmo,* 677 F.2d 692, 699 (9th Cir.), *cert. denied,* 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982). It applies only in rare instances where "statutes are drawn in such broad terms that there is no law to apply." *Overton Park,* 401 U.S. at 410, 91 S.Ct. at 820. There must be law to apply in the particular case, not simply law in the abstract, which could possibly be applied. *Id.; Arizona Power Authority v. Morton,* 549 F.2d 1231, 1239 (9th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977); *Strickland v. Morton,* 519 F.2d 467, 470 n. 4 (9th Cir. 1975).

I agree with defendants that the actions of Bibles and Lowe are not reviewable. Neither WSRA nor the implementing regulations provide any legal standard by which to review their decision to base the Section 7(a) determination on the NCP alternative operating mode. Likewise, no legal standard in the statute or the regulations governs how the determination is to be made, what experts are to be consulted, or how the opinions of those consulted are to be evaluated, weighed, accepted, or rejected. Having no legal standard by which to resolve the two questions presented, I find that they fall within the narrow exception of Section 701(a)(2).

However, I rule alternatively out of an abundance of caution. Assuming I have jurisdiction to review the Section 7(a) determination, I rule that it cannot be set aside under the "arbitrary and capricious" standard of Section 706(2)(A). Under this highly deferential standard, I must give substantial weight to the agencies' construction of their responsibilities under the statute they are entrusted to administer. *Chevron United States, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984), *rehearing denied,* 468 U.S. 1227, 105 S.Ct. 29, 82 L.Ed.2d 921 (1984); *Marathon Oil Co. v. United States,* 807 F.2d 759, 765 (9th Cir.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987).

Section 7(a) of WSRA, 16 U.S.C. § 1278(a), as it pertains to this issue, authorizes the administering agency to make a determination whether a project will "unreasonably diminish the scenic, recreational, and fish and wildlife values" of a designated river. The Section 7(a) determination made by Bibles and Lowe addressed each of these areas in a reasonable manner.

It was not arbitrary or capricious for them to limit their determination to the NCP alternative selected in the Regional Engineer's ROD. On the contrary, this was a reasonable and efficient way to focus their attention and resources. Should future circumstances result in the selection of a different operating mode for this project, nothing would preclude BLM and the Forest Service from exercising their authority under 16 U.S.C. § 1278(a) to make a determination based on the selected alternative at that time.

Likewise, it was not arbitrary or capricious to determine that, if successful passage is achieved, the dam will not unreasonably diminish the fish values of the Rogue River. The administrative findings are not inconsistent with this conclusion. Clearly, lack of fish passage causes the greater diminishment, because it makes inaccessible 27 miles of coho habitat and 55 miles of summer steelhead habitat. With successful passage, the dam will still eliminate an unspecified portion of valuable upstream habitat, including the low-gradient habitat immediately above the dam. However, it is not inconsistent to find that with successful passage, the

loss of habitat will cause a lesser diminishment which does not rise to the level of "unreasonable diminishment" for WSRA purposes.

■ Finding no inconsistencies in the administrative findings or any showing of bad faith or improper behavior, I decline to consider evidence of the deliberative processes of the decision makers involved.[7] *Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825; *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004–5, 85 L.Ed. 1429 (1941), *rehearing denied*, 314 U.S. 707, 62 S.Ct. 52, 86 L.Ed. 565 (1941).

Accordingly, the claims against Bibles and Lowe should be dismissed.

## 2. ACTIONS OF THE DIVISION ENGINEER AND THE CORPS

■ Plaintiffs contend Division Engineer Harrell violated WSRA in two respects. First, they contend Harrell failed to secure a determination under Section 7(a) before issuing his ROD. Second, they contend he failed to withhold approval, presumably by withdrawing the ROD, after the administering Secretaries issued the adverse Section 7(a) determination.

■ First, I reject defendants' contention that the ROD is not reviewable under the APA, 5 U.S.C. § 704. Section 704 provides for judicial review of "final agency action". Finality turns on whether the agency has finished its decisionmaking process and whether the result directly affects the parties. *Franklin v. Massachusetts*, —— U.S. ——, ——, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992); *Hecla Mining Company v. EPA*, 12 F.3d 164 (9th Cir.1993).

The ROD is the formal record of the Division Engineer's decision to implement the NCP alternative rather than the No Action alternative preferred by plaintiffs or any of the other alternatives considered in the Second EISS. *See* 40 C.F.R. § 1505.2; 33 C.F.R. § 230.14. It is a definitive statement of the Corps' position at the culmination of the NEPA decisionmaking process. I am satisfied that it meets the standards required for review under Section 704 to the same extent that a final EIS meets those standards.

■ Next, I reject the contention that WSRA required Harrell to secure a determination under section 7(a) before issuing the ROD. Neither 16 U.S.C. § 1278(a) nor the implementing regulations expressly contain such a requirement. At most, the statute requires written notice prior to recommending authorization or requesting appropriations.[8] This notice requirement is implemented by 36 C.F.R. § 297.4.

■ To the extent plaintiffs rely on this notice requirement,[9] their claim must fail. First, I am satisfied that the ROD is neither of the actions by which the notice requirement is triggered, i.e. it does not "recommend authorization" of a water project; nor does it "request appropriations" to begin construction of a water project. Second, defendants fully complied with the notice requirement when the triggering actions did occur at the commencement of the project. *See Oregon Natural Resources Council v. Marsh*, 628 F.Supp. 1557, 1560 n. 2 (D.Or. 1986). Finally, even if notice was required prior to the ROD, I find that the notice requirement was satisfied. The Secretaries received actual notice of the Corps' intent to issue the ROD through their participation in

---

7. Accordingly, I decline to consider the depositions of Director Bibles and Regional Forester Lowe and the declaration of Mr. King.

8. The pertinent part of Section 1278(a) provides:

No department or agency ... shall recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river was established ... or request appropriations to begin construction of any such project ... without advising the [administering] Secretary

... in writing of its intentions so to do at least sixty days in advance. 16 U.S.C. § 1278(a).

9. The extent of plaintiffs' reliance on this notice provision is unclear. They expressly reject any reliance on the notice provision as it appears in the statute. Plaintiffs' Memo in Support of Their Cross–Motion for Summary Judgment at 46 n. 15; Plaintiffs' Reply at 2 n. 1. However, they assert the form of the notice provision as it is implemented in 36 C.F.R. § 297.4(a) and (b). Plaintiffs' Memo in Support of Their Cross–Motion for Summary Judgment at 47–48.

the NEPA process. Actual notice is sufficient, even if the Corps did not provide the technical written notice required by 16 U.S.C. § 1278(a) as specified in 36 C.F.R. § 297.4(b). *Coalition For Canyon Preservation, Inc. v. Hazen,* 788 F.Supp. 1522, 1529 (D.Mont.1990).

The remaining duties of the agencies and the administering Secretaries are set forth in Section 1278(a) as follows:

No department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on October 2, 1968. 16 U.S.C. § 1278(a).

Since the Elk Creek project is approximately 57 miles upstream from the designated section of the Rogue River, the second quoted sentence regarding developments above or below a designated area is most pertinent.

Plaintiffs contend the foregoing statutory language together with the stated purposes of WSRA (set out in 16 U.S.C. §§ 1271, 1272) and the legislative history of WSRA imply a duty upon the Corps to secure a determination from the administering Secretaries before issuing the ROD. I am satisfied that the statutory scheme and implementing regulations are sufficiently clear that no implication is necessary.

The statute gives the Secretaries authority to make the determination whether a project will adversely affect or unreasonably diminish the values to be protected by WSRA. As noted above, the matters of whether to make a determination under Section 7(a), when such a determination should be made, and how it should be made are left to the discretion of the administering Secretary.

The statute ensures that the administering Secretary has the opportunity to make that determination at critical times by requiring notice from agencies as described above— before recommending authorization and when requesting appropriations. In addition, the implementing regulations require agencies to ensure that the Secretary is apprised of ongoing environmental studies on water projects undergoing analysis under NEPA to facilitate identification of wild and scenic river issues. 36 C.F.R. § 297.6. In this way the administering Secretary is able to monitor ongoing projects and to make determinations under Section 7(a) at any time that relevant issues are identified.

■ The statute does not authorize (much less require) agencies to request, compel, or otherwise "secure" a determination from the administering Secretary. Their only duty, apart from complying with the described notice requirements, is to withhold assistance when the administering Secretary issues a determination that the particular project has the undesired effect—unreasonable diminishment of the four river values identified in the statute.

That Harrell declined to seek or "secure" a Section 7(a) determination before issuing the ROD does not violate any provision of WSRA or the implementing regulations.

■ Finally, plaintiffs contend that Harrell violated WSRA because he did not withdraw the ROD when the administering Secretaries made their determination that Elk Creek Dam unreasonably diminishes the fish values of the designated section of the Rogue River. I agree with this claim.

I have no problem finding that the issuance of the ROD amounts to "assistance" to construction of a water development within the meaning of section 1278(a). It is a required step before construction can begin (or resume in this case) on any project requiring an EIS. 40 C.F.R. § 1505.2. Such assistance is prohibited under section 1278(a) once the administering Secretaries determine that the development will "unreasonably diminish" any of the four relevant river values of a designated river.

With respect to the fish values of the designated section of the Rogue River, the Section 7(a) determination made in this case found:

> The unfinished Elk Creek Lake dam results in unreasonable diminishment to the anadromous fisheries resource because of impediments to migration and some loss of spawning and rearing habitat. The condition of diminishment will continue until such time as successful fish passage is assured. In the NCP Alternative, passage is assured only in concept. When the Corps of Engineers is able to complete and implement a system which effectively provides fish passage, the condition would not be considered unreasonable diminishment.

Section 7(a) Determination at 5. "Successful passage" is defined as passage "which allows full and undelayed passage during all critical times for all migrating salmonids." Section 7(a) Determination at 6.

Defendants contend that the reference to the "unfinished Elk Creek dam" indicates that the administering Secretaries did not object to the completion of the project, only to the project in its unfinished state. However, the quoted language makes clear that the unreasonable diminishment will not continue or abate depending on whether the dam is completed. The unreasonable diminishment will continue until the dam is redesigned to allow "successful passage" as defined above. The reference to fish passage that is "assured only in concept" refers to the finding in the Second EISS that fish passage "may be feasible 77—91% of the time". This is simply another way of saying that the Elk Creek Dam NCP alternative as it is now designed and as it was described and selected in the ROD does not provide "successful passage" and therefore unreasonably diminishes the fish values of the Rogue River.

Accordingly, the ROD violates WSRA and should be withdrawn. The Corps may not proceed with the Elk Creek project until the consent of the administering Secretaries is secured. However, I am certain that this would not preclude the Corps from exploring other designs to provide for successful passage, as they assert they are committed to do. *See* 36 C.F.R. § 297.5(b). The Corps is

encouraged to gather the critical information necessary, perform scientific analysis, determine whether successful passage is feasible, and, if appropriate, design and prepare plans for such passage. The Corps is also encouraged to consult with the Forest Service, the BLM, and any other resource agency to identify fish passage measures which will eliminate the objections of the administering Secretaries. I also encourage the Corps to continue its efforts to sustain the coho and steelhead fisheries through its interim "trap and haul" program.

## V. RELIEF AVAILABLE

 I am satisfied that the mandatory injunctive relief sought by plaintiffs is not appropriate at this time. Plaintiffs present a compelling argument that desperate measures are urgently needed to save the Elk Creek fisheries. However, I am ill equipped to make the technical judgment that demolition of the dam is the most appropriate measure. Such technical judgments should be made by the agencies with jurisdiction and expertise in these matters. Likewise, I am ill equipped to make the policy decision that the Elk Creek fisheries should be saved. That is simply not my role.

 My role is to enforce the procedural requirements of NEPA and WSRA to insure that those who are equipped to make these judgments are well informed and make well considered decisions. *Kleppe v. Sierra Club,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21; *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 838 (D.C.Cir.1972). Accordingly, though I am reasonably satisfied that mandatory injunctive relief is available under these statutes in some circumstances, it is appropriate to give defendants the opportunity to respond to my rulings on remand.

## V. CONCLUSION

Based on the foregoing, I find that defendants have completely satisfied the requirements of the remand in *Oregon Natural Resources Council v. Marsh.* Accordingly, plaintiffs' pending motion to modify the injunction is denied and the case should be

774

dismissed. However, defendants' pending motion to dissolve the injunction is denied based on the rulings below.

With respect to the NEPA issues raised in *Oregon Natural Resources Council, et al. v. Harrell,* I find it is appropriate to remand to the Corps for further consideration of the new information described in this opinion.

With respect to the WSRA claims against defendants Bibles and Lowe in *Harrell,* I find that there are no genuine issues of material fact to be resolved and that Bibles and Lowe are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552.

With respect to the WSRA claims against defendant Harrell and the Corps in *Harrell,* I remand for further study and design, if feasible and appropriate, of fish passage measures that will eliminate the objections of the administering Secretaries.

The injunction is dissolved to the limited extent necessary to permit defendants to proceed in accordance with this opinion.

The foregoing opinion constitutes my findings of fact and conclusions of law whether specifically so designated or not. Rule 52, Fed.R.Civ.P.

IT IS SO ORDERED.